# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | Michael T. Mason |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3336 | **DATE** | 7/19/2002 |
| **CASE TITLE** | Motorola, Inc. vs. DBTel, Inc. and D&B Holding Co. Ltd | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Report and Recommendation** is hereby submitted to Judge Nordberg recommending that plaintiff's motion for preliminary injunction be denied. Specific written objections to this report and recommendations may be served and filed within 10 business days from the date this order is served. Fed.R.Civ.P. 72(a). Failure to file objectionswith the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this court in the report and recommendations. Lorentzen vs. Anderson Pest Control,64F.3d 372,330 (7th Cir. 1995.) Enter Report and Recommendation.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 2 2 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | U.S. DISTRICT COURT | docketing deputy initials | 210 |
| | Mail AO 450 form. | CLERK | | |
| ✓ | Copy to judge/magistrate judge. | 02 JUL 19 AM 9: 15 | 7/19/2002 | |
| | | | date mailed notice | |
| KF | courtroom deputy's initials | FILED-ED 10 | KF | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOTOROLA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02 C 3336 **DOCKETED** |
| v. | ) | |
| | ) | Hon. John A. Nordberg JUL 2 2 2002 |
| DBTEL INC. and | ) | Mag. Judge Mason |
| D&B HOLDING CO. LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Motorola, Inc. ("Motorola") sued defendants DBTEL, Inc. and D&B Holdings, Inc. ("DBTEL") for breach of contract and to protect its confidential and proprietary information. It seeks a preliminary injunction, asking that we enjoin DBTEL from using Motorola's trade secrets and also from designing, manufacturing or selling cellular phones that use the so-called GSM bandwidth for six months. The District Court referred the matter to us to conduct a preliminary injunction hearing. After reviewing the parties' written submissions and conducting a six day hearing, we recommend that the District Court DENY the motion for preliminary injunction. In rendering this decision, the Court has considered the testimony of the witnesses, the documents admitted into evidence, the pre-hearing and post-hearing arguments and briefs of the parties, and the relevant case law. Pursuant to Fed.R.Civ.P. 52, we make the following findings of fact and conclusions of law.

## I. Facts

Most of the facts in this case are not in dispute; the major areas of disagreement concern the correct interpretation of those facts. As is the situation in many breach of contract cases between former business partners, the Court has been asked to provide a legal analysis and opinion of what at the time were purely business decisions, made with little concern for the niceties of contract law.

### A. The Parties' Initial Relationship

Motorola is a leading manufacturer of cellular phones; it holds numerous patents for various types of cell phone technology. (Tr. pg. 361 (Tay)).[1] Some time in the 1990's, Motorola sought an outside manufacturer for its cell phones in Asia. (Tr. pp. 363-364 (Tay)). In early 1998, it began meeting with DBTEL to negotiate an agreement under which DBTEL would assemble phones for Motorola. (Id.). In August, 1998, the parties entered into a so-called Assembly Agreement (the "Agreement"), which was drafted by Motorola.[2] (Agr., Pl. exh. 1 (hereinafter, Agr., § xx); Tr. pp. 305-306 (Peng)).

Prior to entering into the Agreement, DBTEL had many years experience in designing and manufacturing various wireless products such as modems, cordless

---

[1] Citations to the hearing transcript will take the form, "Tr. pg. xx ( )" The name of the speaker will appear inside the parentheses.

[2] DBTEL makes the familiar argument that it was induced to enter into a one-sided contract by Motorola's promise that it always took good care of its business partners, and that it was not necessary to change clauses that were disadvantageous to DBTEL because no one would worry about the Agreement's details once it was signed. We are not swayed by DBTEL's request for "underdog" status; the company has over twenty years experience designing and manufacturing electronic equipment in Asia, and in the past it has partnered with and sold products to such major corporations as Phillips Semiconductor, AT&T, Siemens and British Telecom. (Tr. pg. 135 (Peng)). DBTEL was represented by counsel during the negotiation of the Agreement, and although it might have felt induced to contract with Motorola by the promise of a profitable, long-term relationship, there is no evidence to suggest anything other than an arms length transaction between two knowledgeable and sophisticated parties.

phones and fax machines. (Tr. pg. 42, (Peng)). DBTEL had limited design experience in the cellular phone industry; in 1996 it had partnered with Texas Instruments and ADI to design a prototype cell phone which it manufactured only in limited test quantities. (Tr. pp. 51, 53-54 (Peng)). The Agreement does not reflect DBTEL's cell phone experience; § 3.6.3 states that prior to entering into the Agreement, neither DBTEL nor any of its affiliates were "assembling, or manufacturing cellular telecommunications devices, nor was any such entity designing, assembling or manufacturing cellular telecommunications devices for itself or others." Peng testified that at the time DBTEL signed the Agreement, the company had ceased its design of cell phones, and that it had never made cell phones to sell in the market. (Tr. pp. 54-56, (Peng)).

B.    The Agreement[3]

The Agreement was entered into as of August 1, 1998, although Motorola did not sign it until December, 1998 and DBTEL did not sign it until January, 1999. The Agreement is long and detailed. In brief summary, it states that Motorola will provide DBTEL with Motorola's confidential and proprietary information and technical know-how for manufacturing cell phones, and DBTEL will use this information to make Motorola phones, exclusively for sale to Motorola.[4] For the purposes of this motion, we will only describe the sections that impact the request for preliminary injunction.

---

[3] In this part, we are only going to describe the contents of the relevant sections of the Agreement, without giving our findings of fact as to how those sections were implemented by the parties. Our findings regarding the actual business relationship between the parties will be addressed in a separate section.

[4] Motorola refers to this type of business relationship as "contract manufacturing," (Tr. pp. 393, 397 (Tay)), or "Original Equipment Manufacturing ("OEM") (Tr. pg. 363 (Tay)). The company also has its own factories in which it makes cellular phones.

1.      Purpose of the Agreement

Pursuant to the Agreement, DBTEL was to manufacture a particular model of cell[5] phone – the Sparky – for Motorola.  (Agr. § 1.1). This phone used a type of technology known as GSM technology.  GSM is "a standard that defines an air interface protocol, often referred to as an 'airlink,' to allow communication over certain frequencies." (Pl. mem. in support of prelim. inj., fn. 3).  Motorola had a major role in the establishment of the GSM bandwidth in the cell phone industry and holds several essential patents of GSM technology.[6] (Tr. pp. 400-401 (Tay)).

In order for DBTEL to be able to assemble the Sparky, it agreed to set up one or more production lines at its factory in Shanghai dedicated to manufacturing for Motorola.  DBTEL agreed to procure at its own expense the so-called "front-end" and model assembly equipment for its Sparky line ("DBTEL's Line Equipment").[7]  Motorola consigned most of the necessary "back-end" testing equipment and software to DBTEL, which equipment was formally known as the "Motorola Line Equipment."[8]  (Agr. §§ 2.2.1, 2.2.2, 2.2.5, 2.3.1).

---

[5]  Like the parties did at trial, we use the terms "cell phone" and "cellular phone" interchangeably.

[6]  Other types of cell phones might use CDMA or TDMA technology.

[7] "Front-end" refers to the creation of a printed circuit board, or "PCB".  "Back-end" refers to the assembly of the phone and particular types of testing each cell phone undergoes before it is ready for market. (Tr. pp. 57-58 (Peng)).  However, at times, the parties seemed to categorize the assembly portion of the phone as a front-end process as well.

[8]  Specific details regarding Motorola's consignment of certain equipment and hardware to DBTEL may become relevant later in the case.  For now, it is enough to understand that DBTEL purchased most of the equipment it needed to set up the front-end of its dedicated production lines from Motorola, and later, Motorola vendors, and that Motorola provided DBTEL with most of the back-end equipment it needed.

Although the Agreement only named the Sparky phone as the product to be built by DBTEL, § 1.4 provided that "the parties may agree to add other models of cellular telephones to the scope of this Agreement, and if so the parties' written agreement to add such other models, and written descriptions of such other models with designations of which MOTOROLA entities will be placing orders for such models, and any amendments of this Agreement specifically for such other models, shall be attached to and become a part of Appendix A hereto."

The parties never formally added any other phone models to the Agreement. (Tr. pg. 94 (Peng)). However, DBTEL did eventually assemble additional phone models for Motorola, and the parties agree (as do we) that the following models were covered by the terms of the Agreement: Shark, Sporty, Stirling, Amio, Mod II and Angel (the "OEM phones"). (Pl. exh. 30; Tr. pg. 92 (Peng)). Section 30.0 of the Agreement provides that if a party fails to insist upon strict performance of any of the terms of the Agreement, the failure shall not be construed as a waiver of any such terms. Thus, the parties' failure to formally add any of the other OEM phones to the Agreement does not waive the requirement for future additions.

2.    Transfer of Motorola's Confidential Information[9]

In order for DBTEL to assemble cellular phones for Motorola, it needed certain information which Motorola described as its trade secrets and confidential and

---

[9] One of the complexities of this case is the blurring between the confidential Motorola information that was legitimately provided to DBTEL so that it could manufacture OEM phones and DBTEL's alleged use of that information to manufacture a non-OEM phone, the DB2009. The witnesses Motorola produced to testify about the identity and use of Motorola trade secrets in general also discussed the secrets in the context of DBTEL's alleged use of those secrets to make the DB2009. Thus, some of the categories of information discussed below only become relevant in relation to the design and manufacture of the DB2009.

proprietary information. Motorola's confidential information is described generally in § 11.1 of the Agreement, and includes, but is not limited to "Motorola's Technology, the Specifications, Motorola's Line Equipment, Motorola Equipment, Consigned Materials, and those drawings, pricing, software, assembly techniques and methods, designs of future products, engineering plans, marketing plans, printed circuit boards, product quality, employee lists, identities of Motorola's suppliers and the terms of their agreements with Motorola, . . ., and information falling under the categories listed in Appendix S attached hereto and other business, engineering and manufacturing information of Motorola."

Appendix S provides a more specific list of the categories of proprietary information Motorola provided DBTEL::

GENERAL
Product Schedule
Motorola Contact People

PRODUCT
Circuit Block Diagrams
Circuit Schematics
Top Overlays
Panel Drawings
Transceiver Numbers
Bill of Materials
Engineering changes and Internal Changes
Proto Reports from Third Party Facilities Manufacturing Sparky
Radio Software and Version Number
Radio Hardware Version Number
Marketing Description
Part Lists
Process Technology Description and Documentation
Prototype Phones and Parts
Trouble Shooting Guide

TESTING
Checklist of Product Electrical Specification

Manual for Manual Test Mode Operation
EMMI Box Interface Commands and Definitions
Test Plan
Analyzer and Uniphase Software
EMMI Box Software for Flash and Testing
Fixture Head and Pallet Status

MATERIAL
Part List
Vendors
Order Authority Part List
Consigned Parts
Plastic Part Version Number

PROCESS
Neutral Software File for Automated Part Placement
Stencil Gerber File
Printed Circuit Board
Process Information Including Control Limit
Engineering Samples
Fixture and Tool Information Including Control Limit (Specifications
and Vendors)
Unique Part Specifications
Manual Process Sheet
Cosmetic Quality Criteria

TECHNICAL TRAINING
Product Information
Process Information
Test Information
Production Equipment and Analyzer Information
Material Information
Final Quality Audit Information

The information in Appendix S was refined during DBTEL's deposition of the

Engineering Manager for the Asia Manufacturing group in Motorola's Personal

Communications Sector, Wilson Ishu, who listed ten general categories of trade

secrets Motorola had provided DBTEL (the "Confidential Information"): 1) Motorola's

step-by-step instructions as to how to assemble and test a GSM cellular phone; 2)

Motorola manufacturing test specifications and software to ensure proper cellular radio operation and functionality; 3) Motorola phasing algorithms for power amplifiers and audio deviation; 4) Motorola "electronic man-machine interface" ("EMMI") hardware and software specific to Motorola cellular radios; 5) Motorola's software tool called "Uniphase" used to analyze and troubleshoot Motorola cellular radios; 6) Motorola's IMEI programming code enabling user to program radio for the customer; 7) Motorola's unique hardware test system configuration and interface to the GSM product; 8) Motorola's final inspection requirements, procedures, and tests; 9) Motorola's Accelerated Life Testing ("ALT") requirements, software, and procedures; and 10) Motorola's Final Quality Assurance ("FQA") equipment, procedures, requirements, and levels, and necessary aspects of Motorola's statistical process controls. (Ishu dep., multiple pages).

Ishu explained each of these categories in his deposition. He testified that Motorola's step-by-step instructions as to how to assemble and test a GSM cellular phone involved assembling the phone in phases and testing the phone between each phase (Ishu dep. pp.104-106).

With respect to the second category of information, "Motorola proprietary manufacturing test specifications and software to ensure proper cellular radio operation and functionality", Ishu testified that while the test set is public knowledge (available from suppliers such as Agilent and Hewlett Packard) the test software to be used on this service monitor is confidential and proprietary to Motorola. (Ishu dep.

pp.109-110).[10] Additionally, Ishu testified that "I'm sure Philips or somebody else might have their own software to use with that test set." (Ishu dep. pg. 63). Later in the deposition, Ishu was cross-examined about what parts of this category are confidential. He focused on Motorola's 12M, which is a document containing test specifications on how to program the phones. As with category one, category two also involves going through steps to test the phone. (Ishu dep. pp. 98, 108-109).

Much of Ishu's third category, "Motorola proprietary phasing algorithms for power amplifiers and audio deviation" was not confidential, such as the automatic frequency control digital to analog converter and checking for an amplification loss. (Ishu dep. pp. 110-111, 113). Additionally, neither the use of pseudo random numbers to mimic noise in RF communications nor testing the pulsed transmit peak power using dBm using an HP test set are proprietary,[11] but the particularly desired power levels and setting up the slope of the power level are. (Ishu dep. pp. 112-116).

---

[10] Ishu goes on to explain, "[t]he service monitor is the test set itself, the box. How you communicate to it depending on the algorithm that you use, you know, for each company. The boxes are the same. The service monitor is the test set we talked about. That's public knowledge." (sic). (Ishu dep. pg. 62).

[11] These two items are listed in Motorola's 12M. Neither party really explains what they are; Ishu merely agreed that they are not proprietary to Motorola.

9

The fourth category of information is Motorola's EMMI.[12] EMMI refers to "electronic man-machine interface." Ishu described the EMMI as "the box that communicate[s] between the phone and the test box. You can call it a translator." (Ishu dep. pg. 87). The actual testing equipment is not confidential to Motorola, it can be purchased from outside companies such as Hewlett Packard. The EMMI itself is modified to be able to "talk" to a Motorola chipset. (Id.). With regard to the fifth category, "Motorola's proprietary software tool called "Uniphase" used to analyze and troubleshoot Motorola cellular radios," Mr. Ishu noted that Uniphase was really only of value for use with a Motorola phone and it would be time consuming and difficult to modify the software for use in another cellular phone. (Ishu dep. pp. 126-130). Specifically, Ishu testified that if you don't have a Motorola chip set, then the Uniphase information "[p]robably wouldn't help you." (Tr. pg. 130 (Ishu)).

Ishu's sixth category, "Motorola's IMEI programming code enabling user to program radio for the customer," is a parameter that is required by the GSM specification; any GSM phone must have an IMEI. Ishu testified that Motorola's particular IMEI programming code is "really only valuable to the extent that you're using a Motorola chip set." (Ishu dep. pp. 130-131).

---

[12] Another piece of Motorola's information that was provided to DBTEL was its "MMI" or Man-Machine Interface. The parties never differentiated between EMMI and MMI, leaving the Court with the mistaken belief that they were the same thing. We subsequently determined they are not the same. The EMMI is used to test phones at the assembly stage (Ishu dep. pg. 87) and the MMI is a piece of software that allows the end-user to employ the phone's various functions. (Tr. pg. 526 (Hanwright)).

10

The seventh category of information is "Motorola's unique hardware test system configuration and interface to the GSM product." Mr. Ishu testified that this is the test equipment architecture, which is the complete test bay interfaced to the various equipment, to the EMMI, and to the phone. (Ishu dep. pg. 131). The purpose of the configuration is to avoid the necessity of having live individuals man the line – the testing is automatically performed by the software. (Id. at 137-139). The actual components of the test bay are not proprietary – most of them are from Hewlett Packard. (Id. at 132-138). Motorola has designed a particular "pin-out" that works with its GSM chipset. (Id.).

Like some of the earlier categories, the eighth category, "Motorola's final inspection requirements, procedures, and tests" have value only if you are using a Motorola phone or are trying to qualify a phone that will be acceptable to Motorola. (Ishu dep. pp. 139-141).[13]   Additionally, Ishu was not certain whether this information had been given to DBTEL. (Id.).

Ishu's ninth category was "Motorola's Accelerated Life Testing ("ALT") requirements, software, and procedures". The evidence at the hearing showed that ALT is an industry-wide process used to test the durability of electronic equipment by subjecting it to various stress tests such as dropping from various heights,

---

[13] Specifically, Ishu testified that "[t]here are, and I don't have, I don't know if we have given it [to DBTEL], but maybe we have during the time, it's inspection criterias for the phone assembly, for the gaps, for the ringer tones, for many of the other things that goes with that that Motorola will hold them and yet it may not be relevant to the other competitors .... That's really about it. The procedures, if you drop the phone at a certain height, it shouldn't come apart." (Ishu dep. pp. 139-141). We note that this description actually appears to be part of the ALT, although Ishu did not identify it as such.

11

attempting to use it at various temperatures, etc. (Tr. pg. 532 (Hanwright)). However, Ishu testified that ALT was only "[t]hermal chambers. Also what we gave them is the test software that, in reference to the cold and thermal testing which is basically software that they put the phone at the hot and cold temperatures and go through their own testing of the program that we gave them." (Ishu dep. pp. 44-45). There was more testimony at the hearing about Motorola's ALT than any other category of confidential information. However, the evidence did not conclusively establish that DBTEL ever received Motorola's ALT specifications, although it did have an ALT lab set up to mimic Motorola's tests. Further, Ishu testified, and additional evidence came in during the hearing that Motorola required all phones built by DBTEL to undergo ALT at one of Motorola's certified facilities, regardless of what type of ALT DBTEL may have performed itself. (Tr. pp. 535-536 (Hanwright); pp. 143-144 (Peng)).

Finally, with regard to the tenth category, "Motorola's Final Quality Assurance ("FQA") equipment, procedures, requirements, and levels, and necessary aspects of Motorola's statistical process controls", Ishu testified that he had no baseline to compare what he knows to be Motorola's statistical process controls with any other company's statistical process controls. (Ishu dep. pg. 148). He had no way of knowing if they are, in fact, different from other companies' statistical process controls. (Id.). And he has no way of knowing if Motorola has, in fact, maintained these statistical process controls as confidential information. (Id.).

Motorola also provided specifications for its manufacturing processes for the products to be assembled by DBTEL and its consigned equipment as described in Appendices C and D to the Agreement. Appendix C, also known as Motorola's 12M, has been filed by Motorola under seal. The 12M consists of Motorola's test methodologies, algorithms unique to Motorola's products and components, and step by step instructions for reference in manufacturing cellular phones. (Ishu dep. pp. 16-23). The 12M specifications cover, among other things, test points, board tests, customer interface tests, final tests, phone call tests, antenna tests, extended call tests, battery tests, calibration tables, and phasing information for GSM cellular phones. (Agr., Appendix C).[14]

During the hearing, the parties introduced other evidence about the alleged Motorola trade secrets in addition to those discussed by Ishu, primarily through the testimony of Martin Hanwright, Director of Operations for Global Alliance and Partnerships Group. Hanwright toured the DBTEL factory in April, 2000 to assess its design and manufacture of a new, non-Motorola-designed phone, the DB2009 (discussed *infra*). He testified about the following confidential, proprietary items, primarily in the context of how they may have been used to design the DB2009: (1) ALT process including the drop test and electro-static discharge ("ESD") test; (2) telephone hardware including the baseband; (3) RF performance testing; (4) testing software; (5) Motorola Quality Assurance; and (6) Motorola manufacturing process. (Pl. exh. 78; Tr. pp. 513, 515-518, 525-533, 558). Hanwright also discussed

---

[14] The parties adduced little evidence regarding the 12M during the hearing other than that information in Ishu's deposition.

Motorola's EMMI. (Tr. pg. 621 (Hanwright)). We will discuss Hanwright's observations concerning these issues below in §§ I(C) and (F), which concern the DB2009.

In addition to transferring certain information to DBTEL, Motorola also provided some of DBTEL's engineers with specific training in the manufacture of GSM phones. Several DBTEL engineers visited Motorola's Libertyville office in 1998, before the Agreement was signed, to receive this training. (Tr. pp. 73-74 (Peng)). Motorola also provided training at its facility in Tianjin, China. (Id.).

Before receiving the Confidential Information from Motorola, DBTEL entered into various non-disclosure agreements ("NDAs").[15] In §§ 2.1, 2.2.1, 2.2.5, 2.2.6, 2.3.1, 2.3.2, 2.5.5, 2.6, 2.8.2, 3.5, and 11.0 of the Agreement and §§ 4, 5, 6, 10, 11, and 17 of the related NDA's, DBTEL agreed that it would maintain as confidential and would not disclose the information and materials provided by Motorola to any third party who had not signed a non-disclosure agreement and who needed access to the information and materials in connection with the Agreement during the term of the Agreement and for 10 years thereafter. In §§ 11.4, 11.6, and 11.7 of the Agreement and §§ 7, 8, and 17 of the related NDA's, DBTEL agreed that it would not use the Confidential Information in any manner for the benefit of any person or entity other than Motorola, including defendants themselves, for the term of the Agreement

---

[15] Our discussion of the confidential information transferred to DBTEL by Motorola should not imply that everything given to DBTEL was in fact a Motorola trade secret or even that DBTEL knew what among the information it received was confidential. As explained below, an identification of Motorola's trade secrets is one of the issues in this case.

and for 10 years thereafter. Finally, §§ 11.8 and 16.2.6 require that upon termination or expiration of the Agreement, DBTEL must return to Motorola the information and materials it received.

### 3. Exclusivity Provision

Defendants agreed in §§ 3.6.1 and 3.6.2 of the Agreement that neither they, nor any of their affiliates or subsidiaries, would design, assemble, or manufacture any GSM phone for themselves or any person or entity other than Motorola – even if such GSM phones do not rely on Motorola's confidential and proprietary information – during the term of the Agreement and for a period of six months thereafter. In the event of termination of the Agreement by DBTEL because of Motorola's breach, the period of exclusivity only lasts for three months.

### 4. Changes and Improvements

Section 3.7 of the Agreement deals with proposed changes and improvements in Motorola's technologies, and the rights and responsibilities of the parties with respect to such alterations. In this section, "Transferred Technology" refers to Motorola's technology regarding manufacture of a GSM as transferred to DBTEL. The Agreement contemplates both "Improvements" and "Changes" to such technology. Changes are more substantial than Improvements, and result in an entirely new cellular phone model, with a new PCB, software release, and/or different cellular telephone integrated circuits. An Improvement merely alters a current model of phone. Section 3.7.2 contemplates the parties signing a separate contract for any Improvements or Changes that Motorola desires DBTEL to

undertake. Further, § 3.7.2.1 discusses the possibility of DBTEL designing a new housing for any of the phones built under the Agreement. If Motorola selects any of the housing designs for its use, they become Selected Designs and DBTEL agrees to grant Motorola a license to make, use, test and sell products incorporating Selected Designs. The Agreement also provides that Improvements and Changes by DBTEL, including those which modify a Motorola PCB layout, are granted to Motorola under a world-wide, royalty-free license. (Agr. § 3.7 et.al.).

5.    Forecasts

Sections 5.1 and 5.2.1 of the Agreement set forth the process by which Motorola was to provide DBTEL with forecasts of the number of phones it estimated it would need in the future. This number was provided in a rolling six-month forecast. Further, each month Motorola would order a number of phones based on the forecast; the quantities listed during weeks 1-12 of the forecast constituted binding purchase commitments, although the orders for weeks 9-12 could be deferred until a later month. Quantities listed for delivery during weeks 13-26 were estimates only and cancelable by Motorola without liability.

6.    Termination

Section 16.2.1 described the parties' ability to terminate the agreement in the event of a default by the other party: "This Agreement may be terminated by either party for failure by the other party to cure a default in any material term or condition of this Agreement. Such termination shall be effective thirty (30) days following written notice of the default, unless the default is cured within such notice period."

DBTEL may terminate the Agreement because of a lack of orders from Motorola, among other reasons. (Agr. § 16.2.5). In such a case, DBTEL must provide Motorola "thirty (30) days prior written notice after Motorola shall have placed no [o]rders for assembled Product[16] during a period of three (3) consecutive months."

### 7. Terms Regarding Injunctive Relief

Section 25.4 of the Agreement states that the actual or threatened disclosure or use of Motorola's confidential information or trade secrets or the design, manufacture or sale of a product in violation of the Agreement's exclusivity provisions would cause Motorola irreparable harm and that Motorola is entitled to *ex parte* injunctive relief to prevent any threatened or continued breach of, and to specifically enforce, the provisions of the Agreement's confidentiality and exclusivity provisions. This section also says that DBTEL will not argue that Motorola does not have an adequate remedy at law for threatened or actual breaches of the Agreement's confidentiality or exclusivity provisions.

Section 16.2.6(G) of the Agreement specifies that the obligations and responsibilities set out in Clauses 2.2.4, 2.2.6, 2.4.3, 2.5.3, 3.5, 3.6, 3.7.4, 11, 12, 13, 14, 15, and 16.2.6, shall survive the termination or expiration of the Agreement.

### C. Design of the DB2009

In the summer of 2000, DBTEL became interested in designing a new phone for Motorola. (Tr. pg. 115 (Peng)). DBTEL envisioned that this phone would be an

---

[16] In the Agreement, Product is defined as the Sparky phone. We assume that as additional OEM phones were added to the Agreement, they became Products as well.

original design and manufacturing ("ODM") project between itself and Motorola; all of DBTEL's previous manufacturing for Motorola under the Agreement was as an OEM. (Tr. pg. 114, 1056 (Peng)). DBTEL named this phone the DB2009. (Id.).

DBTEL designed the DB2009 by using a chipset solution and software it obtained through a partnership with Philips Semiconductor. (Def. exh. 6; Tr. pp. 236-237 (Quiniou)). DBTEL and Philips entered into an agreement in March, 2000, although Philips began working with DBTEL in the summer of 1999. (Pl. exh. 71, Def. exh. 6). DBTEL represented to Motorola that the DB2009 was designed solely using information from Philips and that it did not incorporate any of Motorola's confidential and proprietary information.[17] (Tr. pp. 118-119 (Peng)). In designing the DB2009, DBTEL knew that the phone would have to be designed and manufactured to Motorola's standards so that it could pass Motorola's quality testing. (Id.).

In April, 2000, a team from Motorola led by Martin Hanwright visited DBTEL's factory to determine if DBTEL had the capability to design and deliver the DB2009 to Motorola within a specific time frame, and have the phone meet Motorola's requirements. (Tr. pp. 580-581 (Hanwright)). Motorola examined DBTEL's front-end and back-end processes. With regard to front-end manufacturing, DBTEL intended to use Motorola's processes, with some modifications to support the Philips chipset. (Tr. pp. 516-517 (Hanwright)). However, the evidence regarding the existence of

---

[17] Peng's statement begs the question of "what exactly are Motorola's trade secrets?" For if we cannot define what those secrets are, no one, including DBTEL, can be certain that they are being used or not. However, the gist of Peng's testimony is that the DB2009 was designed completely separately from any work for Motorola on the OEM phones, and thus, DBTEL independently developed each aspect of the phone and its technology, with help from Phillips.

Motorola proprietary information at the front-end, or PCB design and assembly stage of the phone, is slim. Hanwright testified that to his knowledge, the front-end process was reasonably standard in the industry. (Tr. pg. 620 (Hanwright)).[18]

Also during the visit, Hanwright visited DBTEL's ALT lab, which Peng said was the same as Motorola's ALT facility. (Tr. pg. 515 (Hanwright)). Hanwright did not inquire as to what Peng meant by this comment and Hanwright's notes from the visit indicate that while the ALT lab's facilities were excellent, its processes were poor. (Pl. exh. 74). At the hearing, Hanwright could recall few specific details about DBTEL's ALT lab and could not explain how it was the same as Motorola's, other than the fact that it contained the same tests (drop test, thermal chamber, electro-static discharge, shaker table) (Tr. pp. 578-579 (Hanwright)). Hanwright also observed a flow diagram of DBTEL's ALT process, which he believed to be the same as Motorola's flow chart, but he did not remember many details about it. (Tr. pp. 579-580 (Hanwright)).

The existence of these types of ALT tests are not proprietary. DBTEL presented copies of the "Accelerated Life Testing" pages from Motorola's publicly available website at the hearing. (Def. exh. 49). The pages list the various tests (i.e., drop, temperature extremes, electro-static discharge, dust, vibration), show the basic ALT flow (i.e. subject phone to an environmental condition then test the phone and subject to another environmental condition), as well as provide some discussion and

---

[18] Hanwright appeared to be referring to the manufacturing process as part of the "front-end". As we explained in footnote 7, *supra*, the parties sometimes included manufacturing in the "front-end" and sometimes in the back-end testing process.

pictures of the "environmental conditions." For instance, with respect to drop testing, the publicly available documents discuss that "Motorola phones are dropped several times so that different surfaces of the phone hit the floor each time," and show a picture of a person dropping a phone from shoulder height on its bottom edge. (Id.). Mr. Hanwright testified that the Motorola drop test involves dropping the phones directly on each of the six faces of the phone (not at angles). (Tr. pp. 611-613 (Hanwright)). With respect to electro-static discharge testing, the Motorola website discusses human static discharge and then indicates that "[t]his electric shock is often thousands of volts of electricity." (Def. exh. 49).

The notes from Motorola's visit to the DBTEL factory in April, 2000 suggest that DBTEL's time line for the production and sale of the DB2009 would be longer than DBTEL anticipated. (Pl. exh. 74). One team member noted that the phone's design flaws would be cured primarily by "trial and error". (Pl. exh. 74). Most of the product validation testing procedures would be acquired from such third parties as Philips, Celecom, and Advantego. (Id.). Further, the DB2009's manufacturing and product performance specifications were not well developed, and DBTEL intended to "rely heavily on Philips support" in writing test code for GSM from scratch. (Id.).

Throughout the spring and summer of 2000, DBTEL continued to work on improving the DB2009, with some assistance from Motorola. (Tr. pp. 518-520, 556 (Hanwright)). Because DBTEL was designing the phone for Motorola, it was important that Motorola's specifications and requirements be designed into the phone early on; failure to do so could result in the need to redesign the phone later,

causing a six or seven month delay. (Id., and pg. 557). Motorola suggested that DBTEL use a specific Motorola phone model – the Leap 2000 – as a benchmark for designing the DB2009.[19] (Tr. pg. 520 (Hanwright)). DBTEL informed Motorola that it was designing the hardware/baseband[20] and radio frequency ("RF")[21] testing based on Motorola's specifications. (Pl. exh. 78). However, there is uncontroverted evidence that DBTEL received know-how and materials from Philips for these tests, including the baseband and power modules. (Tr. pp. 214 *et. seq.* (Quiniou), Def. exh. 133, 139, 178; Stipulation of the Parties on Offer of Proof ("Stip."), Hsu at ¶ 4).

On August 15, 2000, DBTEL provided Motorola with a report updating the status of the DB2009. In it, DBTEL updates Motorola about the DB2009's mechanical readiness, electrical readiness, manufacturing readiness, material readiness, and its software and field testing. (Pl. exh. 77). Among other things, the document reports that the DB2009 has passed the majority of the ALT requirements, including Motorola's drop test.

Although Motorola presented evidence during the hearing that DBTEL requested substantial support and information from Motorola on the DB2009 project

---

[19] The Leap 2000 was a Motorola phone that DBTEL helped redesign pursuant to § 3.7.2.1 of the Agreement. DBTEL's work was a Selected Design and the parties did not sign a separate agreement regarding the Leap phone. (Tr. pp. 106-107 (Peng)). The parties did not provide any additional evidence regarding the Leap phone.

[20] This refers to optimizing talk/stand-by time, the baseband interface spec are all based on Motorola specification, which is basically the amount of the electrical current or the amount of power that the phone is drawing from the battery has to meet certain limits, so that the battery will last for a certain amount of time for the customer. (Tr. pg. 526 (Hanwright)).

[21] RF refers to "how the phone communicates with the network thought the antenna." (Tr. pg. 527 (Hanwright)).

throughout the summer and fall of 2000 (Tr. pp. 518-519 (Hanwright), Def. exh. 20, 21), documents created contemporaneously indicate that until November, 2000, DBTEL was still performing the bulk of its work on the DB2009 without much Motorola input.  For example, on October 14, 2000, Motorola prepared for another evaluation of the DB2009, to be undertaken at the end of October.  In preparing for the evaluation, Motorola noted that the status of large portions of the DB2009 were unknown to it, and various types of testing had yet to be started.  Specifically, Motorola had no information about the DB2009's ALT, its safety approval tests, its proto-certification, its accessory approvals, or information about product or material support. (Def. exh. 152).  Further, DBTEL had not begun any Motorola field testing, and since its software support was to come from a third party (Philips), its capability and cycle time were likewise unknown to Motorola. (Id.).

Two weeks later, after Motorola completed its evaluation of the DB2009 project, Motorola projected that the phone's estimated "ship acceptance" date ("SA")[22] was March 19, 2001, over four months away. (Def. exh. 150).  In a memo to other Motorola executives involved in the DB2009 project, Hanwright reported that the phone still had SAR[23] and ALT failures, as well as the need for software approvals.  He also noted DBTEL owned its MMI, but it planned a final release of

---

[22] Ship acceptance refers to the time when a cellular phone is ready to be shipped out for sale in the marketplace.

[23] SAR stands for Specific Absorption Rate.  The parties never defined how SAR is used in the phone.

this software to be "synergy like."[24] Throughout the evaluation, Motorola noted the assistance DBTEL was receiving from Philips in various aspects of the process. Prior to attaining SA, Motorola and/or DBTEL planned to have Philips software engineers on site to fix problems. (Id.).[25]

After the October evaluation, Motorola did provide DBTEL with additional information concerning its SA requirements for the DB2009. (Def. exh. 79). However, the parties presented little evidence on the scope and content of information DBTEL received from Motorola, as opposed to working to develop the processes itself, with help from Philips.[26] The parties also continued discussing the possibility of entering into an agreement regarding the DB2009. Although Motorola considered accepting the DB2009 for sale as a Motorola phone, it never made a definite commitment to DBTEL,[27] and in January, 2001, it informed DBTEL that it had decided not to partner with it regarding the DB2009. (Pl. exh. 33). Once

---

[24] Motorola called its MMI "synergy." DBTEL was apparently trying to make its MMI similar to Motorola's when it was building the DB2009 for Motorola. Hanwright testified that the current DB2009, model A, does not use the Motorola MMI. (Tr. pg. 604 (Hanwright)).

[25] Throughout this period, DBTEL was assuring Motorola that the DB2009 was very close to meeting Motorola's specifications, and that it anticipated being able to start production in December, 2000. (Def. exh. 21, 117). However, Motorola's evaluation indicated that DBTEL was overly optimistic about the DB2009's SA date, and that the phone still was not compatible with several of Motorola's requirements and tests.

[26] Plaintiff testified that DBTEL's independent development (i.e. without help from Motorola) of manufacturing expertise for a GSM phone would take six or seven months. (Tr. pp. 556-557 (Hanwright)).

[27] For example, in June, 2000, Hanwright told DBTEL, "you may want to continue on the program schedule so that when a final decision is made, and assuming it is favorable, DB2009 is well positioned as a product close to SA requirements." (Def. exh.19). In early December, 2000, Motorola and DBTEL signed a non-binding memorandum of understanding regarding the DB2009 project. (Def. exh. 8).

Motorola rejected the DB2009, pursuant to the terms of the Agreement, DBTEL was barred from continuing to design or manufacture the phone or offering the phone for sale until six months after the termination of the Agreement.

D.    DBTEL's Termination of the Agreement

In June, 2000, Motorola informed DBTEL that it should not increase its factory's capacity because Motorola had revised its purchase forecasts downward for the rest of the year and for 2001. (Pl. exh. 25). On July 21, 2000, Motorola informed DBTEL that it was going to be phasing out its purchases of OEM phones from DBTEL by the end of the year, 2000. (Def. exh. 4).  Between July and December, 2000, Motorola cut the number of OEM phones it ordered each month. DBTEL protested the move in letters to Motorola, complaining that its factories now had excess capacity and up to 2000 idle workers. (Def. exh. 62, 71; Pl. exh. 25).

On February 14, 2001, DBTEL sent Motorola a letter which discussed various problems between the two parties.  In the letter, DBTEL listed four issues which it contended constituted a breach of the Agreement by Motorola.  These issues were: 1) the failure of Motorola to provide accurate and binding forecasts[28]; 2) the failure of Motorola to make timely payments; 3) the failure of Motorola to pay for certain expenses as required under the Agreement;[29] and 4) the failure of Motorola to order

---

[28] Motorola does not deny that it failed to provide binding forecasts to DBTEL at various times during the first two years of the parties' relationship.  In July, 2000, Motorola executive Doug Wick sent DBTEL an e-mail discussing upcoming build plans in which he stated "I would like to thank you for your support this year and working with us under some very difficult situations with our numbers and plans changing on a monthly bases." (sic) (Def. exh. 73).

[29] At the hearing, Motorola did not provide evidence disputing its failure to make some timely payments or to pay for certain expenses, but it did provide evidence (as we explain below)

any phones since December 1, 2000.[30] In the letter, DBTEL informed Motorola that because of the breaches, DBTEL was terminating the Agreement between the two parties.[31]

Motorola refused to accept DBTEL's purported termination of the Agreement, denying that it was in breach and arguing that even if it was, DBTEL had not given Motorola thirty days to cure any deficiencies. (Pl. exh. 44).

E.    Taishan

During 2000, DBTEL and Motorola also began negotiations to produce a jointly designed phone named Taishan.   Taishan was to be made with excess materials from one of the parties' OEM phones, the Shark, which had proven unpopular in Asia because of its large size. (Def. exh. 10, 59). DBTEL had experience in shrinking technology, and worked with Motorola to design a smaller phone using the excess Shark inventory. (Tr. pg. 818 (Tu)). The phone used the Shark's PCB [32] and DBTEL-designed housing. (Tr. pp. 819-820 (Tu)).

---

that it cured these deficiencies.  It also provided evidence that DBTEL owed Motorola money as well.

[30] Specifically, the letter stated that Motorola had failed to place binding orders in the manner provided in the Agreement.  The parties agree that Motorola stopped ordering OEM phones by December 1, 2000.

[31] For the purposes of this motion, we do not need to determine conclusively whether DBTEL's February 14, 2001 letter was an effective termination of the Agreement.  Instead, we only need to decide whether Motorola has a reasonable likelihood of proving that DBTEL did not terminate the Agreement and thus that it did breach the exclusivity period.

[32] Both DBTEL and Motorola had parallel teams working to design a PCB for the Taishan, although DBTEL contends that it sent several engineers to teach the Motorola team its shrinking technology. (Tr. pg. 820 (Tu)).  Motorola eventually decided to use the Motorola-developed PCB. (Tr. pg. 441 (Tay)).

25

During the end of 2000 and beginning of 2001, the parties' actions sometimes indicated that the business terms for Taishan were controlled at least partly by the Agreement and sometimes as if Taishan required an entirely separate contract. For example, on June 15, 2000, Motorola declared Taishan to be an official project and suggested that "Motorola and DBTEL shall prepare a contract that provides the framework for this and future ODM projects between DBTEL and Motorola CSSO." (Def. exh. 28). And when DBTEL began complaining to Motorola about its dramatic reduction in its orders of OEM phones in the second half of 2000, Motorola never told DBTEL that its purchases of Taishan would more than make up the loss in OEM business or that Taishan was the next model to be purchased under the Agreement. Throughout the summer and fall of 2000, Motorola and DBTEL attempted to negotiate a separate contract for the Taishan project.

The first evidence we have that Motorola considered Taishan to be covered by the Agreement is its October 31, 2000 letter to DBTEL in which Motorola indicates that it intended to follow the terms of § 3.7.2.1 of the Agreement with regard to ownership and licensing of Taishan. (Pl. exh. 29). That is, it considered Taishan to be a Selected Design for which DBTEL was merely designing new housing. DBTEL never sent a formal response to this letter, but DBTEL executive Johnson Shih testified that he called a Motorola individual named Zhang Tao to object to making Taishan a Selected Design. (Tr. pg. 838 (Shih)).

After Motorola cancelled the DB2009 project in January, 2001, and DBTEL purported to cancel the Agreement in February, 2001, the parties stepped up their

negotiations for a Taishan contract. (Def. exh. 13, 33, 35, 169). Indeed, DBTEL reiterated to Motorola the need for a new Taishan contract because the Agreement was no longer in force. (Def. exh. 92). The parties were able to agree to certain terms that differed from those in the Agreement. For example, Motorola agreed to provide DBTEL with a binding quarterly forecast instead of the six month rolling forecast provided in the Agreement. (Tr. pg. 443 (Tay)). Motorola also agreed to issue DBTEL a letter of credit so that it got paid on a regular basis and to amortize tooling costs over the course of the Taishan project. (Id.). These terms covered the same issues DBTEL raised as its reasons for cancelling the Agreement. Additionally, the draft Taishan agreements that the parties were exchanging dealt with both design and manufacturing issues. (Def. exh. 12, 34, 167).

In January, 2001, Motorola placed an order for five-thousand units of Taishan as a test to see if the phones could clear Chinese customs. (Tr. pg. 739 (Tu); Pl. exh. 124). The order was later cancelled and then reissued as an order for fifty units in March. (Def. exh. 159; Tr. pg. 739 (Tu)). The first purchase orders for amounts of Taishan phones to be sold to the public were for April, 2001. (Def. exh. 160; Tr. pg. 104 (Peng)).

On March 22, 2001, Mr. Gan requested Johnson Shih of DBTEL to send him the final version of Taishan Quotation 12,[33] which the parties had been negotiating, so that Motorola could issue purchase orders ("POs"). (Def. exh. 177, 124). Upon

---

[33] The quotations were not full formal contracts, but price sheets that contained some of the major contract terms such as for delivery and payment, and also referred to the contract the parties had been negotiating for other terms.

receipt of quotation version 12, Motorola issued its POs for Taishan. (Def. exh. 65). DBTEL believed that this exchange of the Quotation 12 and the purchase orders constituted a contract. (Tr. pp. 895-899 (Shih)). The parties never finalized or signed any of the draft Taishan agreements. (Tr. pp. 959-963 (Shih)). In continuing to work together to manufacture Taishan, the parties operated under a hodge-podge of terms and conditions, some of which were negotiated specifically for Taishan (such as the letter of credit and forecasting), and some of which are found in the Agreement and/or one of the draft Taishan contracts. (Tr. pg. 442 (Tay)). Despite the parties' ongoing disputes, DBTEL continued to manufacture Taishan phones for sale to Motorola until the parties' agreement to do so ended on March 31, 2002.

F.    Alleged Use of Motorola's Confidential Information in the DB2009

Motorola contends that it would be nearly impossible for DBTEL to have designed and built the DB2009 without using Motorola's trade secrets.  The evidence demonstrates that although DBTEL was constantly striving to design and manufacture a cell phone that comported with Motorola's standards, up until the date Motorola cancelled the DB2009 project, the phone did not yet meet Motorola standards in various areas.  Further, the evidence shows that one of Motorola's concerns about the DB2009 was the fact that Philips, which was providing software and other support to DBTEL, did not understand Motorola's requirements or needs, which would result in a phone that would not meet Motorola's specifications. (Def. exh. 150). At the same time, DBTEL was trying to convince Motorola that the

DB2009 was up to Motorola's standards and could pass its quality testing. (Pl. exh. 78).

In June, 2001, Motorola engineer Alex Wong, who was working in DBTEL's factory on Taishan, wrote an e-mail to his superiors that he had observed certain Motorola test software on one of the lines manufacturing the DB2009. (Def. exh. 156). Specifically, Wong notes that "all the stations of Flexing(4), Board test(9) and Radio test(6) are all using the Motorola Fte interface v.2.91. The sequence is exactly like ours. But the source code they used to test may get some modification. The interface between test bay and DB2009 is a level shifter not EMMI." In the e-mail, Wong also notes that DBTEL is almost finished building a new testing system for board and radio testing, presumably which is not related to Motorola's.

As a result of this e-mail, in June, 2001, Motorola wrote DBTEL a letter accusing it of using Motorola know-how on the lines used to manufacture the DB2009. (Pl. exh. 62). In the letter, Motorola stated that "[w]ithout a license, DBTEL has no right to use the Motorola know-how and proprietary information on which DBTEL's new core competency is based." (Id.). After writing this letter, Motorola did not take any other steps to stop DBTEL from this alleged illegal use of Motorola trade secrets until it filed this lawsuit in May, 2002.[34]

By March, 2001, DBTEL considered that the Agreement was terminated. (Tr. pg. 122 (Peng)). In July, 2001, DBTEL began selling the DB2009 on the open

---

[34] Motorola did send a second copy of the letter to DBTEL in September, 2001, but again, did not take any action on it or follow up in any way. (Tr. pp. 252-253 (Peng)).

market. (Tr. pg. 121 (Peng)).[35] In the June, 2001 letter described above, Motorola alleged that sale of the DB2009 infringed on some of Motorola's patents, but did not mention the exclusivity period. (Pl. exh. 62). Motorola did not take any action to stop DBTEL from selling the DB2009 until it filed this lawsuit in May, 2002.

During the hearing, Motorola also presented information implying that DBTEL had transferred Motorola confidential information to a company called Ares, which had not signed an NDA. At some point in time (the parties do not specify when), DBTEL made a power-point presentation to Motorola proposing a strategic alliance between Motorola and DBTEL/Ares. The objective of the strategic alliance appeared to be to adapt one of Motorola's chipsets for ODM manufacturing in order to increase sales to the China market. (Pl. exh. 88). Within the presentation, DBTEL lists one of its strengths as the fact that it is "[w]ell-experience (sic) with Motorola product requirements (MMI, SAR, ALT..)." Peng testified that Ares was a separate company from DBTEL that was not established until 2001, and that DBTEL was a major shareholder in the company. (Tr. pp. 1182-1183). He denied that DBTEL ever provided Ares with any Motorola confidential and proprietary information. (Tr. pg. 1118 (Peng)).

H.    Outstanding Issues.

During the hearing, the parties produced evidence regarding sums of money each side allegedly owes the other for unpaid invoices, equipment, and damages.

---

[35] The Agreement provided for a three month exclusivity period in situations where DBTEL terminated the Agreement because of a Motorola breach.

For example, Motorola contends that DBTEL still owes it $34 million for consigned equipment. DBTEL, for its part, contends that Motorola still has not paid certain outstanding invoices, and further, that Motorola owes it for over $200 million in monetary losses connected to Motorola's failure to order enough OEM phones, resulting in idle production capacity. Other than as they relate to DBTEL's argument that it had valid grounds to terminate the Agreement, we will not make findings of fact or conclusions of law with regard to these issues because they do not effect our decision regarding the preliminary injunction.

## II.    Conclusions of Law

Although DBTEL objects to our jurisdiction over this matter, we find that jurisdiction is proper in the Northern District of Illinois. A federal district court in Illinois has personal jurisdiction over a party involved in a diversity action only if Illinois courts would have personal jurisdiction. *See Klump v. Duffus,* 71 F.3d 1368, 1371 (7th Cir. 1995) *cert. denied,* 518 U.S. 1004 (1996), *cited in McGowan v. Johnson*, No. 01C6906, 2002 WL 1396956 (N.D.Ill., June 26, 2002). To determine whether a court can have personal jurisdiction over a non-resident, one must look at the state's long-arm statute. 735 ILCS 5/2-209. In addition to listing various acts by a non-party that confer jurisdiction, the statute provides that an Illinois court may exercise jurisdiction on any basis permitted by the state or federal constitution. 735 ILCS 5/2-209(a) and (c).

The Due Process Clause of the Fourteenth Amendment permits an Illinois court to exercise jurisdiction over a non-resident defendant only if the defendant has

certain "minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) *quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1940). In this case, we need to determine whether there is specific jurisdiction over DBTEL, since its contacts with Illinois are 'arising out of or related to [its] contacts with the forum." *RAR, Inc. v. Turner Diesel Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997).

A defendant does not need to be physically present in Illinois in order to be subject to jurisdiction or have minimum contacts with the state. *See Hanson v. Denckla*, 357 U.S. 235, 251-253 (1958). Instead, the defendant must show that it has purposely availed itself of the rights and privileges of conducting activities in Illinois, such that it invoked the benefits and protections of Illinois law. *Id.*

In this case, DBTEL has sufficient minimum contacts connected to its Agreement with Motorola so that it could reasonably anticipate being haled into court here. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). DBTEL entered into a complex, long-term contract with an Illinois company and the evidence shows that its contacts with Illinois were regular over the term of the Agreement, even if they were not constant. Top DBTEL executives journeyed to Illinois to discuss the possibility of entering into an agreement with Motorola, and then engineers from the company spent two weeks in Illinois learning Motorola's manufacturing processes specifically so they could perform under the Agreement. The parties communicated constantly by e-mail, letter and phone; some of the

individuals with whom DBTEL corresponded were located in Illinois. We are satisfied that DBTEL's contacts with this forum were significant enough to confer jurisdiction on this Court.

Motorola seeks a preliminary injunction against DBTEL on two issues. First, it seeks to enjoin DBTEL from using any of Motorola's trade secrets or confidential and proprietary information in the design, manufacture, or sale of GSM phones for anyone other than Motorola. Second, Motorola seeks to enforce the six month exclusivity period contained in the Agreement, which period it contends did not begin until after the parties finished manufacturing the Taishan phone on March 31, 2002.

In order to obtain a preliminary injunction, a party must satisfy five criteria. First, it must show: 1) some likelihood of success on the merits; 2) that no adequate remedy at law exists; and 3) that it will suffer irreparable harm if the injunction is not granted. *See Ty, Inc. v. The Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001) (*citing Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). "If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Ty, Inc.*, 237 F.3d at 895. Last, the court considers whether and how the public interest will be affected if the injunction is granted or denied. *Id.*" This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.*

Because Motorola seeks separate forms of injunctive relief for the trade secret issue and the exclusivity period, we will analyze the five factors separately for each.[36]

A.    Trade Secrets

Motorola asks that we enjoin DBTEL from using any of its confidential and proprietary information when designing or building phones for sale to any entity other than Motorola. In its complaint and brief, it alleged that it believed DBTEL had used Motorola trade secrets to manufacture and test the DB2009. It claims that DBTEL has both breached the Agreement's trade secret provisions as well as violated the Illinois Trade Secret Act ("ITSA"), 765 ILCS 1065.

To succeed on its trade secret claim, Motorola must prove both the existence of trade secrets and that DBTEL misappropriated those secrets or its actions threaten the disclosure of such secrets. 765 ILCS 1065/3(a). Under the Illinois Trade Secret Act ("ITSA"), a trade secret is defined as:

> "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (1)     is sufficiently secret to derive economic value, actual or potential, from not being generally known to other

---

[36] Motorola argues that it should not have to demonstrate either irreparable harm or an inadequate remedy at law because §25.4 of the Agreement absolves it from having to demonstrate either aspect if DBTEL breaches the Agreement. DBTEL argues that this clause did not survive the termination of the Agreement, even if that termination occurred as late as April, 2002. Even if this clause did survive, the evidence of DBTEL's breach of any portion of the Agreement is not so significant as to obviate Motorola's need to show either irreparable harm or an inadequate remedy at law. And as we explain below, it is Motorola's failure to demonstrate either of these elements that is really fatal to its request for a preliminary injunction.

persons who can obtain economic value from its disclosure or use; and

      (2)    is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, or confidentiality. 765 ILCS 1065/2(d).

We deny Motorola's request for an injunction on the trade secrets issue because:1) it has not specifically defined its confidential information so that the Court could fashion an effective injunction order; 2) it has shown only a slim likelihood of success in proving that the DB2009 contains Motorola trade secrets; and 3) it has not demonstrated that monetary damages will not suffice to fully compensate it for any use by DBTEL of Motorola trade secrets. Unlike cases in which an employee leaves a company to work for a competitor and takes with him or her the company's confidential information, this case does not involve any allegations of "stolen" trade secrets. *Cf. PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995). Indeed, both parties agree that Motorola transferred to DBTEL certain information and equipment it designated as confidential in order for DBTEL to be able to manufacture cellular phones under the Agreement. The parties also agree that after completing work on the Taishan phone, DBTEL returned Motorola's equipment to it.[37] Thus, the only

---

[37] As we explain below, one of Motorola's arguments in favor of a finding that the Taishan phone was covered by the Agreement is the fact that DBTEL did not return Motorola's confidential information in February, 2001, when it purported to cancel the Agreement. However, this fact is of little evidentiary value since DBTEL needed the information and equipment to manufacture Taishan, whether it was covered by the Agreement or not.

question is whether there is a likelihood that Motorola will be successful in proving that DBTEL is using its trade secrets to make the DB2009.[38]

### 1. Identification of Motorola's Trade Secrets

Motorola's first problem is that the evidence it adduced regarding what its trade secrets and confidential information are and how they were used by DBTEL is confusing, inconsistent, and lacks specificity. In reading and re-reading Ishu's deposition and Hanwright's testimony, we find that the parties throw around technical terms and phrases without ever explaining what many of them mean or how they fit into a Motorola phone. Further, it appears that many aspects of Motorola's process for creating a cellular phone involve publicly available equipment and standards. We cannot issue an injunction generically banning DBTEL from using any of Motorola's secrets if DBTEL does not know what those secrets are.[39] "[I]t is not enough for a plaintiff to point to broad areas of technology and assert that something there must have been secret..." *Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595 n.2 (7th Cir. 2001). Fed.R.Civ.P. 65(d) requires that injunctions "shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Indeed,

---

[38] The only issue relevant to our analysis is whether the DB2009, as it is currently being sold in the market, is manufactured or tested using Motorola trade secrets. If DBTEL originally sold a DB2009 version that contained Motorola trade secrets, but has since stopped, this fact is relevant to Motorola's claim for damages, but not to its claim for an injunction.

[39] We are not saying that we do not believe that Motorola's process for designing, building and testing a cellular phone does not contain any trade secrets at all. We are sure they do have certain trade secrets and confidential and proprietary information. However, it was not clearly identified at the hearing.

in reviewing the evidence, we ran into difficulties ourselves trying to determine exactly what Motorola wanted to keep secret and what information it contends that DBTEL still has in its possession. The testimony at the hearing referred to Motorola's "specifications," "testing software" and "processes" for various aspects of its design and manufacture of cellular phones, but little information about what made them secret or how exactly they were used in the Motorola manufacturing process.

A large portion of Motorola's evidence regarding its trade secrets come from Ishu's deposition, but Ishu's affidavit doesn't say any of the categories are secret, and at his deposition, Ishu didn't know and hadn't investigated whether any of the 10 categories are generally known to others in the industry. (Ishu dep. pp. 67-68). Furthermore, Mr. Ishu makes his claims of unique-confidential-proprietary information with no familiarity with the work of Motorola's GSM competitors. (Ishu dep., pg. 37).

Although Ishu testified in his deposition about the way certain categories of Motorola information fit into the manufacturing and testing process, many of the categories described information that was only useful for a Motorola chipset or else were comprised of equipment that was purchased in the market or processes that were widely known. Further, a lot of the information Ishu describes is too vague or confusing to be identifiable as a trade secret. For example, the third category of information Ishu describes is Motorola's phasing algorithms for power amplifiers and audio deviation. Much of this category is, by Ishu's own admission, not confidential. He does, however, state that the particularly desired power levels and "setting up the

slope of the power level" are proprietary. The problem is that we have seen no evidence identifying what those power levels are or whether they are used by others in the industry as well.

Ishu again discusses phasing algorithms in connection with the second category of information, "manufacturing test specifications and software to ensure proper cellular radio operation and functionality," but does explain what the difference is between the use of the algorithms here as opposed to category three. And in describing category two further, Ishu repeatedly stated that the confidentiality stemmed from performing the testing in phases – the same explanation he gave for the first category, "Motorola's step-by-step instructions on how to manufacture a cell phone."[40] We had a similar problem trying to understand what was proprietary about Ishu's tenth category, "final quality assurance equipment, procedures, requirements and levels and necessary aspects of Motorola's statistical process controls." We do not know if Motorola developed a particular piece of equipment itself, if it employed a procedure not known generally, etc.

In sum, we cannot point to any particular process, procedure, piece of software or equipment, or standard that Motorola uses to make cell phones that is entirely proprietary and confidential to it.

2.     DB2009 Development

---

[40] Although Motorola alleges that its step-by-step manufacturing process is confidential, it never told the Court what those steps entail.

Motorola argues that the DB2009 incorporates Motorola trade secrets because, 1) it was designed and first built during a time when DBTEL had little or no cell phone "know how" other than what it received from Motorola; 2) at least one Motorola engineer reported that he saw a piece of Motorola test software on the DB2009 production line in June, 2001; and 3) A DBTEL/Ares presentation included a statement that the companies were familiar with some of Motorola's requirements and specifications.

Motorola's evidence to support the above arguments is shaky. First, DBTEL provided evidence that it designed its DB2009 in a "clean room" separate from its Motorola line equipment, using a chipset solution and other assistance provided by Philips Semiconductor. Motorola doesn't dispute that DBTEL used Philips know-how to design the PCB for the DB2009, and in fact, its contemporaneous notes from 2000 reflect that Philips had substantial input into the phone above and beyond the chipset.

Motorola contends that DBTEL could not have gotten the DB2009 from the Philips-designed PCB stage to the salable phone stage without using Motorola trade secrets. However, it agrees (and even provided evidence) that an entity such as DBTEL could independently develop manufacturing capabilities for a GSM phone, although such work might take up to seven months. DBTEL began working with Philips to design a GSM phone in 1999, it began presenting its work to Motorola in April, 2000, and continued refining its design and manufacturing processes until the

phone finally went to market in June, 2001 -- more than enough time for DBTEL to have independently developed the DB2009.

Further, the evidence shows that throughout 2000, Motorola expressed concern over whether the DB2009 could be manufactured according to Motorola's specifications. There is little evidence that Motorola ever believed that the DB2009's quality was up to Motorola's standards. Further, the evidence shows that Motorola was unaware of the status of many aspects of the DB2009's development or testing. Thus, the inference that Motorola asks us to make -- that DBTEL must have used Motorola know-how and processes to design and manufacture the DB2009 -- is not supported. For if DBTEL had used Motorola trade secrets to design and build the DB2009, the likelihood that it would have passed Motorola's quality assurance and other tests would be much greater.

Motorola's allegation that Alex Wong saw Motorola test software on the DB2009 production line in June, 2001 does not convince us that the DB2009 is currently using Motorola trade secrets. Wong himself stated in the e-mail that parts of the line he observed did not use Motorola's secrets (for example, there was no EMMI). He also noted that DBTEL was currently working to develop its own replacement test software not based on Motorola's software, and that it would probably be completed within two months. Motorola's letter to DBTEL in response to Wong's observations does not specify which particular type of software DBTEL is allegedly using, or otherwise provide DBTEL with detailed information about its alleged infringement.

As for the Ares issue, the parties did not adduce any evidence about when the presentation was made or what the relationship between Ares and DBTEL was at the time. The evidence that DBTEL transferred confidential information to Ares is weak and circumstantial; a much easier inference to make would be that DBTEL was merely advertising its strengths to Motorola, without having shared its knowledge of Motorola requirements with Ares.

Further, in addition to the information in Ishu's deposition being too vague to assist the Court, Hanwright's testimony does not support Motorola's contention that the DB2009 incorporates Motorola trade secrets. He provides double hearsay regarding an event that occurred a year ago, and general comments from Peng that the DB2009 would be made with processes and an ALT just like Motorola's. This is not enough, especially since DBTEL denied that it ever received any Motorola ALT specs from Motorola or that it ever incorporated any Motorola-specific ALT requirements into DBTEL's ALT process for the DB2009 phone. (Tr., p. 1046 (Peng)).

Motorola generally argues that its software would have been useful even with the Philips chipset, but can offer no specifics. It offers no evidence to support its contention that DBTEL could have modified the Motorola testing software to manufacture the DB2009. Ishu's testimony indicates that such a process would be time consuming and difficult. On the other hand, DBTEL's engineers provided an offer of proof that indicates DBTEL designed its own software with the help of Philips, including so-called message-driver software with the RF alignment

procedure, production message interface software for the phone, and production testing software. DBTEL obtained its testing equipment from third party Rhode & Schwarz. (Stip. ¶¶ 3-7).

Motorola argues that §11.9 of the Agreement requires DBTEL to demonstrate either its own independent development of a GSM phone that does not contain or rely on Motorola trade secrets or else demonstrate that any alleged Motorola confidential information is actually available to the public. As we explained above, DBTEL presented evidence that it had both the time and assistance from Philips to develop its own GSM phone.[41] This, combined with the fact that Motorola failed to specifically identify its trade secrets demonstrates to us that Motorola's likelihood of success in proving that DBTEL's DB2009 as currently sold on the market contains Motorola trade secrets is negligible at best.

Since Motorola's likelihood of success on the merits with regard to its trade secrets claim is negligible, it must show significant irreparable harm if it is to obtain a preliminary injunction. This, it cannot do. Motorola's biggest obstacle is its nearly one-year delay in bringing suit after it first suspected that DBTEL's DB2009 contained Motorola trade secrets. "Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable

---

[41] For example, a representative from Philips testified that Philips provided DBTEL with the core of the solution including the hardware, all the software layers, and generic MMI in order to allow the development of the GSM handset. In addition, they delivered all the software layers which allow the customer to customize its look and feel around this core. Likewise, Philips furnished all the interfaces to DBTEL so that DBTEL could test its products. (Tr. pp. 210-211 (Quiniou)). Philips also provided DBTEL with the training it needed for the development of the product. (Tr. pp. 214-220 (Quiniou)).

harm if a preliminary injunction is not entered." *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d 891, 903 (7th Cir. 2001). The question is whether the delay has caused the defendant to be "lulled into a false sense of security or act[ ] in reliance on the plaintiff's delay." *Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1025 (7th Cir. 1979).

It is undisputed (as shown by Motorola's letter to DBTEL) that Motorola suspected at least as early as June, 2001, that part of the DB2009 production line used a piece of Motorola testing software. And yet other than one general allegation in the middle of that letter, which also discussed many other issues, Motorola did nothing to assert its trade secret rights. Such inaction on Motorola's part could certainly have lulled DBTEL into believing that the trade secret issue was moot, and thus it could continue selling the DB2009 without worry that it might be accruing liability for wrongful use of trade secrets.

We do not know why Motorola did not file suit or take other steps to protect its trade secret rights in June, 2001. It may have been a calculated business decision on Motorola's part related to the parties' manufacture of Taishan, not to sue DBTEL earlier, but it does not translate into irreparable harm if DBTEL continues to manufacture the DB2009 phones during the pendency of the lawsuit.

The same June, 2001 letter provides evidence that Motorola has an adequate remedy at law if it is ultimately successful in proving its trade secrets claim. The letter states, "[w]ithout a license, DBTEL has no right to use the Motorola know-how and proprietary information on which DBTEL's new core competency is based." (Pl.

exh. 62). Motorola is apparently willing to license its confidential information in exchange for a price; indeed this was the basis of the Agreement. Unlike a situation involving "stolen" trade secrets, Motorola is not worried about DBTEL gaining access to information it otherwise would not have, only that it may use the information without paying Motorola its due. If some population of DB2009 phone is found to contain Motorola trade secrets, the question of damages is simply a matter of assigning a license value to DBTEL's sales.

Because we find that Motorola cannot prove either irreparable harm or the inadequacy of money damages, we do not need to reach the next factors, harm to DBTEL or the public interest. The injunction is denied with regard to the trade secrets claim.

B.    Exclusivity Period

Motorola does demonstrate more than a negligible likelihood of success in proving that the Agreement did not end until the Taishan production was finished on March 31, 2002 – and thus that DBTEL is breaching the exclusivity period. The evidence is somewhat mixed regarding whether DBTEL effectively terminated the Agreement and whether it covered the terms of Taishan, but there are plenty of facts to support Motorola's position. For example, although one of the reasons DBTEL gave for termination was Motorola's failure to order any phones for three months, DBTEL actually sent the termination letter after only two-and-one-half months of no orders. And if one includes the 5,000 Taishan phones that were ordered in January, 2001 (and not cancelled until March, 2001), then DBTEL did not have a month with

no phone orders until February, 2001. Finally, Motorola provided evidence that DBTEL's work on the Taishan phone was similar to its work on the Leap 2000, a phone redesign project that was covered under the definition of "selected design" in § 3.7.2.1 of the Agreement. Although the parties did not discuss the Leap project at length, its similarities to Taishan were significant enough to support Motorola's contention that the Taishan was simply another selected design.

Further, the evidence could be interpreted to show that Motorola used Taishan's business terms to cure any alleged breaches under the Agreement, and that the Agreement survived after DBTEL's purported termination. The parties never signed any of the formal draft Taishan agreements that they were discussing, and when negotiations broke down, they were far apart on terms. Thus, we find it reasonable that at least some of the terms of the Agreement might have survived, especially the exclusivity period.

Although Motorola succeeds in proving a likelihood of success on the merits of this issue, it again fails to show either irreparable harm if an injunction does not issue or an inadequate remedy at law. Motorola's failure to inform DBTEL that it was breaching the Agreement by selling the DB2009 in June, 2001 quite possibly lulled DBTEL into a false sense of security that Motorola would not enforce the exclusivity provision of the Agreement (or even cause DBTEL to believe that Motorola had dropped its argument that the Agreement was still in force.) And if the Court later finds that the exclusivity period did not begin until the end of Taishan, we have no evidence that Motorola cannot be fully compensated for its losses by a

combination of a disgorgement of profits from DBTEL for its sales of the DB2009 as well as a new period of exclusivity.

For the reasons stated above, we do not believe that Motorola has demonstrated that it is entitled to preliminary injunctive relief, and thus we recommend that the District Court DENY its motion for a preliminary injunction.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir. 1995).

ENTER:

*Michael T. Mason*

MICHAEL T. MASON
United States Magistrate Judge

Dated: July 19, 2002